# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Sage P. J.,[1]                                    Case No. 23-cv-3052 (JFD)

          Plaintiff,

v.                                                         **ORDER**

Leland Dudek, Acting Commissioner of
Social Security,

          Defendant.

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Sage P. J. seeks judicial review of a final decision by the Defendant Acting Commissioner of Social Security, which denied Plaintiff's applications for disability insurance benefits and supplemental security income. The matter is now before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 12), Defendant's Brief (Dkt. No. 15), and Plaintiff's Reply (Dkt. No. 16).

Plaintiff argues that the final decision should be reversed for the following reasons: (1) the administrative law judge ("ALJ") who authored the final decision erred in considering opinion evidence from Plaintiff's psychologist and psychiatrist; (2) the ALJ did not properly consider the severity and frequency of Plaintiff's self-reported symptoms; (3) the ALJ failed to include symptoms of autism in the residual functional capacity

---

[1] The District of Minnesota has adopted a policy of using only the first name and last initial of nongovernmental parties in Social Security cases.

("RFC")[2] assessment; and (4) the ALJ did not include time off-task, unscheduled breaks, or excessive absences in the RFC. The Commissioner disagrees with Plaintiff's positions and asks the Court to affirm the final decision. As set forth fully below, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole and that the ALJ committed no legal error. The Court therefore affirms the Commissioner's decision.

## I.    Background

People with disabilities can qualify for financial support from the Social Security Administration ("SSA") through one or both of its assistance programs: the Disability Insurance ("DIB") Program under Title II of the Social Security Act and the Supplemental Security Income ("SSI") Program under Title XVI of the Act. *Smith v. Berryhill*, 587 U.S. 471, 475 (2019) (citing *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988)). DIB is a program that provides support to those who worked and had sufficient social security taxes withheld from their pay over their working life to qualify for coverage if they become disabled. *Id.*; 42 U.S.C. § 423(a) (guaranteeing benefits for insured disabled people). SSI is a public assistance program that provides support to people with disabilities, whether or not they have paid social security taxes, who demonstrate financial need. *Smith*, 587 U.S. at 475; 42 U.S.C. § 1381a (guaranteeing support to eligible "aged, blind, or disabled" people); 20 C.F.R. § 416.110 (explaining program's purpose).

---

[2] RFC is a measure of "the most [Plaintiff] can still do despite [Plaintiff's] limitations." *See* 20 C.F.R. § 404.1545(a)(1).

Plaintiff filed applications for both DIB and SSI on May 27, 2021, and alleged that her disability began on that date. (*See* Soc. Sec. Admin. R. (hereinafter "R.") 11, 83, 88.)[3] She was 28 years old. (R. 83, 88.) Plaintiff's medical conditions included autism, chronic depression, anxiety, panic disorder, and attention deficit hyperactivity disorder ("ADHD"). (*See* R. 83, 88.)

## A.    Relevant Facts[4]

Plaintiff attended regular psychotherapy sessions with Julie Beckmann, L.P. (R. 553–54.) In May 2021, Plaintiff told Ms. Beckman that her mother's death in October 2020 had severely and negatively impacted her life. (R. 554.) Plaintiff was employed at that time and reported significant stressors at her job due to irritability, anger, and lack of coping strategies. (R. 554.) Physical examination findings included that Plaintiff's speech was clear and articulate; her affect was frustrated and irritable; her intellectual level of functioning was normal; her thoughts arose at a normal speed; her judgment was impacted by a "very negative view"; and her insight was fair. (R. 555.)

Plaintiff sought adult rehabilitative mental health services ("ARMHS"), and a functional assessment was completed on May 13, 2021. (R. 770.) Plaintiff reported mental health symptoms of poor concentration and memory loss, forgetfulness, anxiety, stress, depression, insomnia, and lack of self-confidence. (R. 770.) She reported crying and

---

[3] The Social Security administrative record is filed at Dkt. No. 11. The record is consecutively paginated on the lower right corner of each page, and the Court cites to those page numbers.

[4] The Court limits its summary of relevant facts to the issues presented for judicial review.

hyperventilating before her shifts at a previous job at a pet kennel due to stress and feelings of inadequacy. (R. 772.) At the time of the ARMHS assessment, Plaintiff was working at a crisis response center and said she was "satisfied" with her job. (R. 772.) She struggled, however, with financial paperwork and household chores. (R. 776.)

On June 9, 2021, Plaintiff sought treatment for anxiety at an emergency department. (R. 546.) She reported having a panic attack, but her symptoms had resolved by the time she reached the clinic. (R. 546.) Her mood and affect were normal on examination. (R. 547.) Three weeks later, Ms. Beckmann described Plaintiff as "very emotional" and sobbing during a therapy session. (R. 859.) Ms. Beckman assessed Plaintiff with "moderately severe" depressive disorder. (R. 860.)

To support her DIB and SSI applications, Plaintiff completed a Function Report on July 22, 2021. (R. 268–75.) She described her work-related limitations as struggling to concentrate on tasks, feeling overwhelmed easily, not understanding expectations, struggling to communicate, and not understanding nonverbal communications. (R. 268.) She needed reminders to shower "at times" but did not need reminders to take medications or take care of other personal needs. (R. 270.) She prepared her own meals daily. (R. 270.) She performed, without assistance, household chores such as sweeping, doing dishes, making her bed, and washing laundry. (R. 270.) She went outside every day and traveled by car, foot, and bicycle. (R. 271.) She shopped in stores and had no issues handling money. (R. 271.) Her hobbies included art, video games, reading, music, riding a bike, gardening, and pet sitting. (R. 272.) She did these activities daily and "pretty well." (R. 272.) She talked on the phone and spent time with people monthly. (R. 272.) Plaintiff reported she

was sometimes irritable toward other people and could not read social or nonverbal cues. (R. 272.) She believed her mental impairments limited her ability to complete tasks, concentrate, understand, follow instructions, and get along with others. (R. 273.)

On July 29, 2021, Plaintiff's psychotherapist Ms. Beckmann wrote that Plaintiff was talkative and engaged, and had reported a decrease in suicidal ideation. (R. 833.) Plaintiff had recently pet-sat for three weeks, which brightened her mood. (R. 833.) The severity of her symptoms was mild to moderate, according to Ms. Beckmann. (R. 833.)

Plaintiff's ARMHS case manager was Rachel Olson. On August 5, 2021, Plaintiff and Ms. Olson telephoned a local clinic together and asked for a referral to an outpatient psychiatrist because Plaintiff was having suicidal thoughts. (R. 829.) Plaintiff said she felt overwhelmed and was having more frequent suicidal thoughts. (R. 829.) Plaintiff said she had a safety plan in place, however, and agreed to go to the emergency department if her symptoms worsened. (R. 829.) Plaintiff saw Ms. Beckmann twelve days later, on August 17, 2021. Ms. Beckmann wrote that Plaintiff was very upset, angry, and frustrated because she misunderstood the appointment time and had to wait 30 minutes. (R. 822.) Plaintiff described an incident that had occurred the previous day, where she felt frustrated and cried in a pharmacy because of a problem with her insurance. (R 822.) But Plaintiff also told Ms. Beckman that her suicidal ideation had declined and that she was finding it easier to think and talk about her mother. (R. 822.) On examination, Ms. Beckman noted alertness, orientation, adequate eye contact, and scattered thoughts. (R. 822.) Ms. Beckmann's examination findings the following month included alertness, full orientation, irritability, stress, and no suicidal ideation. (R. 809.)

Plaintiff attended occupational therapy appointments with Samantha Barrie for sensory processing and emotional dysregulation. At the first appointment in July 2021, Plaintiff said that her depression affected her hygiene to the point that she was not able to brush her teeth. (R. 851.) She also struggled with daily routines and finishing tasks. (R. 849–50.) Sensory processing testing revealed dysregulation in the areas of tactile sensitivity, taste/smell sensitivity, movement sensitivity, sensory-seeking behavior, and low energy/weakness. (R. 852.) As a coping mechanism, Plaintiff used headphones in public to reduce dysregulating noises. (R. 831.) Using fidgets in social situations was also helpful but not an option when she needed them most, like at work. (R. 851.) In September 2021, Plaintiff told Ms. Barrie that her new dental hygiene routine, which included the use of a chew tube to transition to teeth brushing, was working "fabulously." (R. 792.) Ms. Barrie recorded that Plaintiff had made continuous improvement with self-care and home-management strategies. (R. 793.) She had achieved the goals of 100% compliance with home programming recommendations and using different calming strategies during times of emotional dysregulation. (R. 793.)

Plaintiff had a medication management appointment with Joshua Baruth, M.D., Ph.D., in October 2021. (R. 1005.) She described her mood as "surprisingly good," despite having brain fog caused by a concussion three weeks earlier. (R. 1005.) Her anxiety had improved, including fewer panic symptoms. (R. 1005.) Mental status examination findings were generally normal. (R. 1006.) Dr. Baruth thought she was "managing relatively well with her psychiatric symptoms" and responding well to current medications. (R. 1007.)

6

In an ARMHS individual treatment plan completed by Plaintiff and Ms. Olson in December 2021, Plaintiff reflected progress in not feeling overwhelmed by emotions. (R. 1084.) She had a good familial support system, lived successfully in her own apartment, and was involved in a local autism awareness group. (R. 1084.) However, she struggled in understanding nonverbal communication, did not always respond appropriately in social situations, overanalyzed communications, and had difficulty communicating her emotions to others. (R. 1084.) Individual ARMHS services were authorized to help Plaintiff achieve her goals of (1) maintaining and improving her mental health and (2) following up on household responsibilities, with two hours per week designated for each goal. (R. 1085–86.)

Plaintiff told Ms. Beckmann in January 2022 that she had nightmares about working. (R. 972.) She described a 12-year pattern of employment in which she could begin a job but became overwhelmed with uncertainty and self-doubt. (R. 972.) Plaintiff felt "socially inept" due to autism and "doomed to never be able to properly get along with people in the world." (R. 972.) Ms. Beckmann wrote, "She is an emotional wreck. She is plagued with constant anxiety and fear that she is going to do something wrong to the point that it is crippling." (R. 972.) Ms. Beckmann wrote, "Severity level today was severe. There is a need for treatment on a monthly basis." (R. 972.)

In a progress note dated February 2, 2022, Ms. Beckmann documented that Plaintiff was "talkative and engaged" and had enjoyed "a surprisingly pleasant few weeks." (R. 963.) She had become more involved with an autism organization, participated in a pancake fundraiser, and gone to the gym every day. (R. 963.) Plaintiff was concerned about finances

and had earned some money caring for pets and children. (R. 963.) The mental status examination was generally normal. (R. 964.)

ARMHS session notes from mid-2021 through 2022 document home visits by Ms. Olson, which generally lasted about an hour and occurred every week or two. (R. 1120–1137.) The sessions focused on Plaintiff's anxiety caused by opening mail, her lack of motivation to complete household responsibilities, and her feelings of being overwhelmed by daily tasks. (R. 1120–21, 1125.) Plaintiff's ARMHS-focused goals were to (1) maintain and improve her overall mental health and (2) complete financial and household responsibilities. (R. 1120–1137.) To achieve these goals, Ms. Olson helped Plaintiff open her mail one piece at a time, role-played calling an Internet service provider and insurance company, helped Plaintiff complete an online application and other forms, and reviewed upcoming appointments, among other things. (R. 1120–21, 1123–25.)

Plaintiff also saw Samantha Plaehn for occupational therapy. On February 17, 2022, Ms. Plaehn noted that Plaintiff "rate[d] her last couple weeks at an A+. Her routines and sensory systems ha[ve] been in a regulated state." (R. 954.) Using fidgets, changing seats in public places, and using self-talk had been successful strategies, in particular. (R. 955.)

Plaintiff met with Ms. Beckmann on March 14, 2022, and reported low energy and brain fog caused by being sick for five weeks with a cough. (R. 935.) She had mismanaged some appointments, was "behind in things that she would like to accomplish," and did not have the energy to do things she normally enjoyed. (R. 935.) Plaintiff brought up feelings of anger, and Ms. Beckmann noted that Plaintiff was developing insight into her problems.

8

(R. 935.) Mental status examination findings were similar to previous progress notes. (R. 935.) Plaintiff did not express any thoughts of self-harm. (R. 935.)

At an appointment with Dr. Baruth on March 24, 2022, Plaintiff said that her allergy symptoms were interfering with sleep and that her ADHD symptoms were causing restlessness and lack of concentration. (R. 931.) Although Dr. Baruth noted that Plaintiff was "unemployed," he also documented her comment that a "change in schedule at work now taking on both morning and evening shifts [disrupted] her daily planning to a certain extent." (R. 931.) Plaintiff also reported that she enjoyed being outside and gardening and that her emotional standpoint was "very stable." (R. 931.) The mental status examination findings included alertness, intermittent eye contact, no overt abnormalities in memory or concentration, euthymic affect, and no abnormalities in thought content. (R. 931.) Dr. Baruth and Plaintiff discussed increasing her Adderall dosage but ultimately decided against it. (R. 931.)

In an individual treatment plan note dated April 27, 2022, Plaintiff's ARMHS case manager, Ms. Olson, reported that Plaintiff was making progress in not feeling overwhelmed, was living successfully in her own apartment, and was involved with a local autism awareness group. (R. 501.) But Plaintiff also struggled in reading nonverbal communication and overanalyzed remarks made to her, which caused some conflict with others. (R. 501.)

Plaintiff was discharged from occupational therapy in April 2022 because she had met all of her goals. (R. 1190.) She had made "great progress" throughout 19 sessions. (R. 1190.) In particular, Plaintiff had developed strategies to assist with daily routines,

9

assembled a sensory tool kit with items to use in moments of emotional or sensory dysregulation, and identified strategies to help manage anxiety. (R. 1190–91.)

On August 26, 2022, Plaintiff had an annual ARMHS assessment to assess her needs and eligibility for continued services. (R. 507.) Under "Social and Interpersonal" considerations, the assessor documented "good relationships with some of her family," "no issues in communication," a "few close-knit friends," "some social activities," and "interpersonal deficits due to ASD[5] diagnosis" that "limit her socialization and ability to form and maintain a strong social support network." (R. 509.) Under "Vocational," the assessor wrote that Plaintiff struggled with her emotional regulation and had difficulty with interpersonal relationships, irritability, and anger. (R. 509-10.) The mental status examination revealed good hygiene, a variable and appropriate affect, rapid but controlled speech, detailed and articulate conversation, knowledge and insight about her mental condition, a cooperative and reflective demeanor, and coherent and linear thoughts. (R. 510.) The clinical summary section reflected that Plaintiff lived independently and managed her own finances and transportation. (R. 511.) Recommendations included continuing with current medications, mental health case management, ARMHS services, and psychiatric appointments. (R. 512.)

Ms. Beckmann completed a Medical Source Assessment form on September 8, 2022. (R. 1142–46.) Ms. Beckman indicated that Plaintiff would be occasionally unable to remember locations and work-like procedures and to understand and remember short,

---

[5] Autism Spectrum Disorder

simple instructions. (R. 1142.) In addition, Ms. Beckman found, Plaintiff would be frequently unable to understand and remember detailed instructions. (R. 1142.) In support of these limitations, Ms. Beckmann explained that Plaintiff experienced debilitating anxiety when she was under pressure to perform and had difficulty controlling emotional responses and outbursts. (R. 1142.)

Ms. Beckmann also indicated that Plaintiff would be frequently unable to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, sustain ordinary routines without special supervision, work in coordination with or proximity to others without being distracted, complete a normal workday and workweek without interruptions from psychological symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 1143.) In support of these limitations, Ms. Beckmann explained that frustration and anxiety caused Plaintiff to feel overwhelmed, which could lead to tears, and that emotional regulation was difficult for her. (R. 1143.)

Ms. Beckmann next indicated that Plaintiff would be frequently unable to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and travel in unfamiliar places or use public transportation. (R. 1144.) In support of these limitations, Ms. Beckmann wrote that Plaintiff's perceptions about herself make social interactions stressful and that Plaintiff does not "perceive things the same as her neuro-normal peers." (R. 1144.) Ms. Beckmann next opined that Plaintiff would be off-task due to her symptoms

for 25% or more of the workday and would be absent from work three or more days per month. (R. 1145–46.)

Ms. Beckmann retired in September 2022, and Plaintiff continued care with Dr. Baruth. In late September 2022, Plaintiff told Dr. Baruth that she was having difficulty balancing time for herself with a more active social life. (R. 1157.) Plaintiff said her mood was "really good" and denied having symptoms of depression. (R. 1157.) The mental status examination was unremarkable. (R. 1158.)

As reflected in an ARMHS functional assessment completed in October 2022, Plaintiff reported having concentration and memory problems, depression and anxiety, lack of self-confidence, and feelings that other people misunderstood her and she misunderstood them. (R. 513.) She struggled with remembering her scheduled appointments but using a calendar helped. (R. 514.) Plaintiff said she quit a previous job at a pet kennel because of stress and feeling that her supervisor did not think highly of her. (R. 515.) She was terminated from another employer "due to a misunderstanding with whether something was available for her to take home." (R. 515.) She ceased working at a crisis response center due to unmanageable symptoms of anxiety, depression, and grief after her mother died. (R. 515.) Her grief worsened symptoms of autism, depression, and anxiety, and caused symptoms of suicidal ideation, but were becoming more manageable. (R. 517.) In her spare time, Plaintiff rode her bike, played video and computer games, threw a Halloween party every year with friends, hung out with friends, went to movies with friends, and volunteered at autism organizations. (R. 516.) Plaintiff had good communication skills, speaking clearly and articulating her needs. (R. 517.) Racing

thoughts sometimes hindered communication. (R. 517.) She struggled to brush her teeth due to obsessive thoughts about unsanitariness. (R. 518.) Cleaning her apartment caused her to feel overwhelmed. (R. 518.)

Ms. Olson responded to an email from Plaintiff's disability representative in November 2022 and said that Plaintiff's symptoms of anxiety, depression, being overwhelmed, suicidal ideation, and autism interfered with her ability to work. (R. 524.) That same month, Plaintiff's representative asked Dr. Baruth if he agreed with Ms. Beckmann's Medical Source Statement, and Dr. Baruth summarily indicated he did. (R. 1222–23.)

### B.    Procedural History

Plaintiff's DIB and SSI applications were denied at both the initial and reconsideration stages of review. She requested an administrative hearing before an ALJ, which was held on November 23, 2022. (*See* R. 37.)

Plaintiff offered the following testimony at the hearing. She occasionally worked as a pet-sitter or house-sitter for friends. (R. 54.) Plaintiff also volunteered about seven hours a month with an autism organization. (R. 55–56.) Plaintiff's mother, who had provided much of her emotional and mental support, died in 2020. (58–59.) Plaintiff struggled with daily tasks like brushing her teeth, opening the mail, and showering due to sensory issues, anxiety, and falling out of routines. (R. 63–65.) Plaintiff used headphones when she became overwhelmed by too many sounds in crowded places. (R. 64.) Medication controlled her panic attacks, but she still experienced stress, anxiety, and emotional dysregulation. (R. 66–69.) Her daily activities included walking, listening to music and audiobooks, shopping

for groceries, going to appointments, talking with friends, and playing video games. (R. 69–71.) When Plaintiff felt overwhelmed, she shut down, and when she had been employed, she estimated, that occurred about every other day. (R. 72.) When she worked at the crisis response center, her supervisors were "wonderful" and "amazing," and her coworkers were helpful and supportive. (R. 56–57.) Dealing with customers was the hardest part. (R. 57.)

The ALJ issued a written decision on December 23, 2022, finding that Plaintiff was not disabled. (R. 8–22.) The ALJ followed the familiar five-step sequential analysis described in 20 C.F.R. §§ 404.1520 and 416.920 in making that determination.[6] At each step, the ALJ considered whether Plaintiff was disabled based on the criteria of that step. If she was not, the ALJ proceeded to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The ALJ determined at the first step that Plaintiff had not engaged in substantial gainful activity since May 27, 2021, the alleged onset-of-disability date. (R. 13.) At the second step, the ALJ found Plaintiff had the following severe impairments: "major depressive disorder, generalized anxiety disorder, panic disorder, autism spectrum disorder, and attention deficit hyperactivity disorder (ADHD)." (R. 14.)

---

[6] The five steps are "(1) whether claimant is engaged in substantial gainful activity, (2) whether claimant has a severe impairment, (3) whether the impairment meets or equals the severity of a listed impairment, (4) whether claimant has the residual functional capacity to perform past relevant work activity, and (5) if claimant is unable to do past work, whether claimant can perform other work." *Delph v. Astrue*, 538 F.3d 940, 946 (8th Cir. 2008) (citing *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993)).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14.) The ALJ considered listings for depressive, bipolar, and related disorders (Listing 12.04); anxiety and obsessive-compulsive disorders (Listing 12.06); autism spectrum disorder (Listing 12.10); and neurodevelopment disorders (Listing 12.11). (R. 14.)

One of the ways in which a claimant can meet a listed impairment is to satisfy certain criteria, commonly referred to as the paragraph A, B, and C criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The paragraph B criteria are (1) "Understand, remember, or apply information"; (2) "Interact with others"; (3) "Concentrate, persist, or maintain pace"; and (4) "Adapt or manage oneself." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.B. The ALJ found that Plaintiff was mildly limited in three of these four categories: understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing herself. (R. 15–16.) These findings were based on evidence that Plaintiff reportedly had trouble following instructions, but no medical evidence of cognitive disorders or memory issues; Plaintiff's providers' descriptions of her as detailed, articulate, intelligent, and knowledgeable; Plaintiff's presentation with sometimes scattered thoughts, but other times linear and logical thoughts and normal concentration; and Plaintiff's engagement in activities such as gaming, dog walking, pet-sitting, childcare, housecleaning, house-sitting, driving, gardening, grocery shopping, preparing meals, managing her personal care, washing dishes, doing laundry, sweeping, and managing her finances. (R. 15–16.) In addition, the ALJ noted, Plaintiff's treatment

was "routine and conservative." (R. 16.) The ALJ pointed out that Plaintiff had described her mental state as an A+ in February 2022 and discontinued individual therapy in August 2022. (R. 16.) In late 2022, the ALJ recounted, Plaintiff said that her mental symptoms were well-controlled and that she was the most social she had ever been. (R. 16.)

The ALJ also found Plaintiff moderately limited in the fourth Paragraph B category: interacting with others. (R. 15.) In reaching this finding, the ALJ considered evidence of Plaintiff's irritability toward others, inability to read social cues, anger management issues, and difficulty interacting with customers in past employment, along with evidence of Plaintiff's appropriate and cooperative behavior around medical professionals, working out daily at a YMCA, volunteering with an autism group, participating in a fundraiser and a grief group, attending a class reunion, gaming with friends and at public events, and doing pet-sitting, housecleaning, and childcare for money for friends and family. (R. 15.)

Because Plaintiff did not satisfy the paragraph B criteria by having a mental impairment or combination of impairments that resulted in one extreme limitation or two marked limitations, she did not meet or equal the severity of a listed impairment and was not disabled under the paragraph B criteria. (R. 16.) The ALJ therefore resumed the sequential analysis.

Between steps three and four, the ALJ assessed Plaintiff's RFC, which is a measure of "the most [Plaintiff] can still do despite [Plaintiff's] limitations." *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). As part of this assessment, the ALJ considered Plaintiff's self-reported symptoms and found that the claimed intensity, persistence, and limiting effect of those symptoms were not consistent with the medical and other evidence

of record. (R. 18–20.) The ALJ also considered the medical source statements from Ms. Beckman and Dr. Baruth, which he explained were not persuasive because the opinions were not supported by or consistent with their own treatment records, treatment records from others, and Plaintiff's relatively conservative mental health treatment. (R. 20.) Nevertheless, to accommodate Plaintiff's mental impairments, the ALJ limited her to occasional interactions with coworkers and the general public. (R. 20.) The ALJ also accounted for Plaintiff's subjective symptoms to the extent they were consistent with minimal objective mental health findings, her successful response to routine and conservative care, her wide range of activities, and the paragraph B functional limitations. (R. 20.)

Ultimately, the ALJ determined that Plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can tolerate occasional coworker and general public interaction, and can tolerate ordinary levels of supervision found in a customary work setting." (R. 17.)

Proceeding to step four in the sequential evaluation, the ALJ considered whether Plaintiff could perform her past relevant work as a customer service representative and determined she could not. (R. 21.) Thus, the ALJ proceeded to step five to consider whether jobs existed in the national economy that Plaintiff could perform, based on her age, education, work experience, and RFC. (R. 21.) Relying on hearing testimony from a vocational expert, the ALJ concluded that Plaintiff could work as a laundry worker, store laborer, or hand packager. (R. 22.) Therefore, Plaintiff was not disabled as defined by the Social Security Act. (R. 22.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. 1.) This made the ALJ's decision the final decision of the Commissioner for the purpose of judicial review.

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or whether the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id*. (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome or because the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for DIB or SSI, the claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of

18

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A).

## III.    Discussion

### A.    The ALJ Properly Considered Opinion Evidence from Ms. Beckmann and Dr. Baruth.

Plaintiff argues that the ALJ erred in considering the persuasiveness of Ms. Beckmann's and Dr. Baruth's opinions. Under 20 C.F.R. §§ 404.1520c and 416.920c, when a medical source provides a medical opinion, the ALJ must consider the persuasiveness of the opinion "using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." 20 C.F.R. §§ 404.1520c(a); *see* 20 C.F.R. § 416.920c(a). Those five factors are supportability, consistency, relationship with the claimant, specialization, and any other relevant considerations. 20 C.F.R. §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5). The two most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "The ALJ need not use the magic words of 'supportability' and 'consistency,' but it must be clear they were addressed." *Svendsen v. Kijakazi*, No. 1:21-CV-1029-CBK, 2022 WL 2753163, at *8 (D.S.D. July 14, 2022). The ALJ "may, but [is] not required to," explain how the remaining factors were considered. 20 C.F.R. § 404.1520c(b)(2); *see* 20 C.F.R. § 416.920c(b)(2). The ALJ's failure to articulate how the ALJ considered the consistency factor or the supportability factor is a legal error that requires remand. *Susan H. v. Kijakazi*, No. 21-CV-2688 (ECT/ECW), 2023 WL 2142786, at *3 (D. Minn. Feb. 21, 2023); *Michael B. v. Kijakazi*, No. 21-CV-1043

(NEB/LIB), 2022 WL 4463901, at *2 (D. Minn. Sept. 26, 2022); *Joel M. B. v. Kijakazi*, No. 21-CV-1660 (PAM/ECW), 2022 WL 1785224, at *3 (D. Minn. June 1, 2022) (citing *Lucus v. Saul*, 960 F.3d 1066, 1070 (8th Cir. 2020)).

An ALJ assesses supportability by analyzing how well the medical source's opinion is justified by that source's use of objective medical evidence. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1); *see* 20 C.F.R. § 416.920c(c)(1). Simply put, the more objective evidence a medical source adduces to support an opinion, the more persuasive the opinion is. 20 C.F.R. § 404.1520c(c)(1); *see* 20 C.F.R. § 416.920c(c)(1).

An ALJ assesses consistency by considering that "[t]he more consistent a medical opinion[] or prior administrative finding[] is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] or prior administrative medical finding[] will be." 20 C.F.R. § 404.1520c(c)(2); *see* 20 C.F.R. § 416.920c(c)(2). That is, the ALJ evaluates whether the medical opinion at issue is consistent with evidence from sources other than the source who rendered the opinion. 20 C.F.R. § 404.1520c(c)(2); *see* 20 C.F.R. § 416.920c(c)(2).

The Court finds here that the ALJ adequately considered and articulated both the consistency and the supportability factors, and substantial evidence on the record as a whole supports the ALJ's findings. With respect to supportability, the ALJ explained that Ms. Beckmann's and Dr. Baruth's opinions were not supported by their own treatment

records, which generally documented minimal mental status examination findings, reports of minimal mental symptoms by Plaintiff, and extensive involvement in daily and social activities. (R. 20.) Ms. Beckmann's progress notes primarily described Plaintiff's symptoms as "mild to moderate." (*E.g.*, R. 833, 982, 997, 1172.) Ms. Beckmann described Plaintiff's symptoms as "moderately severe" or "severe" only twice. Dr. Baruth's description of Plaintiff's symptoms was even more benign than Ms. Beckmann's. Further, the ALJ explained, the extreme limitations denoted by Ms. Beckman and Dr. Baruth were not consistent with the conservative course of mental health treatment Plaintiff received from them, nor did they recommend "more intensive mental health treatment." (R. 20.)

As to the consistency factor, it is apparent from the ALJ's discussion that the ALJ considered Ms. Beckmann's opinion to be inconsistent with evidence from Dr. Baruth, and Dr. Baruth's opinion to be inconsistent with evidence from Ms. Beckmann. (*See* R. 20.) For example, Ms. Beckmann's opinion was not supported by Dr. Baruth's mental status examination findings, and Dr. Baruth's opinion was not supported by Ms. Beckmann's mental status examination findings.

Plaintiff has identified other evidence in the record that could be considered consistent with or supportive of Ms. Beckmann's and Dr. Baruth's opinions, but that does not mean the ALJ's persuasiveness assessment is *not* supported by substantial evidence. *See Pierce v. Kijakazi*, 22 F.4th 769, 771 (8th Cir. 2022). It was the ALJ's duty to resolve the conflicting evidence in the record, *Richardson v. Perales*, 402 U.S. 389, 399 (1971), and the ALJ adequately articulated why he did not find the opinions of Ms. Beckmann and

Dr. Baruth supported by their own treatment records or consistent with evidence from other sources.

Plaintiff takes issue with the ALJ's comment that Ms. Beckmann and Dr. Baruth did not recommend any "more intensive" treatment, but an ALJ does not err by considering a physician's approach to treatment. *Pierce*, 22 F.4th at 773. Therefore, the ALJ appropriately considered that Ms. Beckmann and Dr. Baruth did not recommend more "intensive" treatment than the relatively conservative treatment they were providing.

Plaintiff also faults the ALJ for not mentioning records from Ms. Olson that documented her assistance to Plaintiff with opening and responding to mail, role-playing interactions, and making appointments. That assertion is incorrect. The ALJ did cite to the exhibit containing the ARMHS records from Ms. Olson and specifically noted that Plaintiff received assistance with paperwork, mail, and phone calls. (R. 16.) It is true that the ALJ commented that "the record contains no reports of any *routine* case management appointments" (R. 16 (emphasis added)), but the Court reads this as meaning that the appointments were not "routine," not that there were no reports at all. That interpretation would correspond with the ALJ's discussion of the sporadic and infrequent nature of the ARMHS appointments. (*See* R. 16.) But even if the ALJ had failed to mention Ms. Olson's notes, "an ALJ is not required to discuss every piece of evidence submitted," *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998), and "an ALJ's failure to cite specific evidence does not indicate that it was not considered," *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

**B.**      **The ALJ Properly Considered Plaintiff's Symptoms.**

Plaintiff argues that the ALJ erred in considering her subjective statements about her symptoms. (Pl.'s Mem. at 13.) The ALJ considered Plaintiff's testimony and statements about her symptoms and found that her impairments could cause the alleged symptoms but that the claimed intensity, persistence, and limiting effects of her symptoms were not consistent with the record. (R. 18.)

In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, an ALJ considers the objective medical evidence and other relevant factors such as:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029, at *7 (S.S.A. Mar. 16, 2016); *see* 20 C.F.R. §§ 404.1529(c), 416.929(c). An ALJ need not discuss every factor, but only the factors relevant to assessing the persistence, intensity, and limiting effects of symptoms. SSR 16-3p, 2016 WL 1119029, at *7.

23

Here, the ALJ determined that Plaintiff's statements about the intensity, persistence, and limiting effects of her mental symptoms (i.e., emotional dysregulation, crying spells, shutting down when overwhelmed, and nervous breakdowns) were not consistent with the objective medical evidence and other evidence of record. Beginning with daily activities, the ALJ pointed out that Plaintiff engaged in pet-sitting and attended large weekend gaming events and a class reunion.[7] (R. 18.) Plaintiff also engaged in daily activities such as household chores, shopping, working out at the YMCA, attending a grief group, and volunteering with an autism organization. (R. 18.)

Turning to the objective medical evidence and efficacy of medications, mental status examination findings were frequently minimal, and her medications were working well. (R. 19.) The severity of her symptoms was most often rated "mild" or "moderate." (R. 19.) Increased ADHD symptoms in March 2022 were due to a reported "change in schedule at work." (R. 19.) Plaintiff grieved the loss of her mother. (R. 18.)

Plaintiff also made subjective statements that contradicted the claimed intensity, persistence, and limiting effects of her symptoms. On self-reported inventories for depression and anxiety, Plaintiff reported only moderate symptoms. (R. 18.) On other occasions, Plaintiff described her mood as "surprisingly good," therapy as "wonderful,"

---

[7] Plaintiff argues that being able to occasionally pet-sit and attend social events does not mean she is capable of competitive employment. (Pl.'s Reply at 2.) The ALJ did not use Plaintiff's participation in these activities as support for a conclusion that she was capable of competitive employment. The ALJ considered activities like pet-sitting and social events in evaluating the intensity, persistence, and limiting effects of Plaintiff's symptoms, which is expressly permitted by SSR 16-3p, § 404.1529(c), and § 416.929(c). Those conclusions, in turn and in combination with other evidence, led to a determination by the ALJ that Plaintiff was not disabled within the meaning of the Social Security Act.

former coworkers as "amazing," and her mental status as an "A+." (R. 18–19.) In late September 2022, she told Dr. Baruth she was more social than she had ever been. (R. 19.)

The Court finds that the ALJ did not err in evaluating Plaintiff's symptoms. Substantial evidence on the record as a whole supports the ALJ's conclusion that the claimed intensity, persistence, and limiting effects of Plaintiff's subjective symptoms were inconsistent with the objective medical evidence and other relevant evidence of record. Moreover, the ALJ still accounted for some intensity, persistence, and limiting effects of Plaintiff's symptoms and limited her RFC to occasional interactions with coworkers and the general public. (R. 17.)

### C.   The ALJ Did Not Wrongly Omit Symptoms of Autism in the RFC.

Plaintiff argues that the ALJ "ignored" evidence of autism symptoms, particularly sensory dysregulation. (Pl.'s Mem. at 17, 26.) She acknowledges, however, that she worked with an occupational therapist for almost a year to develop techniques and routines to cope with sensory dysregulation. By February 2022, Plaintiff told her occupational therapist that her last few weeks had been "an A+," and the therapist wrote that Plaintiff's "routines and sensory systems ha[ve] been in a regulated state." (R. 954.) Plaintiff was discharged from occupational therapy in April 2022 because she had met all of her goals. The Court concludes that this substantial evidence on the record as a whole supported the ALJ's decision not to include symptoms of sensory dysregulation in the RFC.

**D.      The ALJ Properly Omitted Time Off-Task, Unscheduled Breaks, and Excessive Absences from the RFC.**

Plaintiff faults the ALJ for not including in the RFC time off-task, unscheduled breaks, or excessive absences in the RFC. (Pl.'s Mem. at 28–30.) These limitations were opined by Ms. Beckmann and agreed to by Dr. Baruth. The Court has determined that the ALJ properly considered Ms. Beckmann's and Dr. Baruth's opinions and found them not persuasive. Plaintiff suggests there is other evidence to support limitations for time off-task, unscheduled breaks, and absences (Pl.'s Mem. at 30), but Plaintiff does not pinpoint that evidence or explain how "some" time off-task or "some" breaks or absences should be quantified in an RFC.

Accordingly, based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.   Plaintiff's Motion for Summary Judgment (Dkt. No. 12) is **DENIED**;

2.   The relief requested in Defendant's Brief (Dkt. No. 15) is **GRANTED**; and

3.   The Commissioner's final decision is affirmed.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:  March 12, 2025                         _s/ John F. Docherty_____
                                              JOHN F. DOCHERTY
                                              United States Magistrate Judge